Filed 7/21/21  In re O.T. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re O.T. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B309706 (Super. Ct. Nos. J072178, J072179) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. DANIEL T., et al., Objectors and Appellants. | |

Daniel T. (father) and B.R. (mother) appeal from the juvenile court's orders terminating parental rights to their children, O.T. and D.T. (the children), and selecting adoption as

the permanent plan.  (Welf. & Inst. Code, § 366.26.)[1]  Appellants contend, only, that the juvenile court erroneously ruled that they had failed to establish the third element of the beneficial parental relationship exception (parental-benefit exception) to the termination of parental rights.  The third element is that termination would be detrimental to the children.  We uphold the trial court's ruling on this issue.

Appellants also claim that respondent Ventura County Human Services Agency (HSA) failed to adequately investigate father's claim of Indian ancestry under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law (§ 224 et seq.).  We accept HSA's concession that its investigation was inadequate and therefore the orders terminating parental rights must be conditionally reversed.  We remand with directions that the juvenile court order HSA to conduct an adequate investigation of the children's Indian ancestry in compliance with the ICWA and California law.  In all other respects, we affirm.

*Parental-Benefit Exception*

To avoid the termination of parental rights under the parental-benefit exception, a parent "must show, by a preponderance of the evidence, three things.  [First,] [t]he parent must show regular visitation and contact with the child . . . .  [Second,] the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.  And [third,] the parent must show that terminating that attachment would be detrimental to the child

---

[1] Unless otherwise stated, all statutory references are to the Welfare and Institutions Code.

2

even when balanced against the countervailing benefit of a new, adoptive home.  When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

*Facts Relevant to Whether Termination of*
*Parental Rights Would be Detrimental to Children*

O.T. was born in October 2017.  D.T. was born in January 2019.  In September 2019 the children were detained and removed from appellants' custody.  Regular visitation was arranged for appellants.

In February 2020 appellants "engaged in a verbal and possibly physical altercation during the visit with the children.  Bystanders called Law Enforcement . . . .  According to the [paternal grandmother,] who was supervising the visit, the mother and father started yelling at each other. . . .  [B]ystanders surmised the father hit the mother."  But mother "denied the father hit her."  Mother claimed "she fell to the ground . . . during a panic attack."  "The children were present . . . ."

After a visit with father in June 2020, O.T. "woke up crying several times in the night yelling, 'no, no, no.'"  At the end of a subsequent visit that same month, O.T. "began to cry and reach for the father.  The father soothed the child . . . ."

During a visit with mother in June 2020, O.T. displayed aggression toward her:  "[M]other read a book and [O.T.] hit her arm, . . . mother pretended to cry and [O.T.] said 'no' aggressively."  O.T. was also aggressive toward mother during a visit in October 2020.  He threw crayons at her.  When mother

3

pretended to cry and asked why he had taken this action, O.T. "preceded [*sic*] to pick up the crayons and throw them again at . . . mother."

During a visit in September 2020, O.T. displayed aggression toward father.  O.T. "almost hit his newborn brother" and D.T. with a stick.  When father removed the stick from O.T. and mother told him to be careful, O.T. "yelled at" mother and "then hit . . . father in the face."  But afterward O.T. "told . . . father that he loves him."   During an earlier visit that same month, the children were affectionate toward father:  "When . . . father arrived the children were happy to see him and hugged the father."

During a visit by both parents in October 2020, the children "had a difficult time . . . with listening, fighting, and biting each other.  [O.T.] would run away from the mother and not listen. . . . The children fought over crayons multiple times and it was difficult to get the children to not aggravate one another . . . ."

At the end of a visit in June 2020, mother "gave the children kisses goodbye and [D.T.] cried."  But during a visit in November 2020, D.T. was aggressive toward mother.  D.T. "ran away. . . .  [M]other attempted to redirect the child, but the child would not comply. . . .  [M]other followed the child and [D.T.] began to hit . . . mother when she was being carried back."

A social worker testified that, at the beginning of parental visits, "the children are excited to see [appellants]."  "[T]hey [the children and appellants] hug, and say hi, and they go off to play [together]."

Father testified:  The children call him "Dad" or "Daddy."  At the end of the visits, "[G]ood-byes are always hard for [O.T.].

4

He always wanted to go home.  He tried to get in [father's] truck constantly."  Father "share[s] a bond with [the] children."

Mother testified:  When she visited O.T., "he would get super excited."  She and O.T. "have a really strong bond.  He tends to come to me when he's upset about something."  "[H]e's grown a big attachment to me . . . .  [W]henever something is wrong with him or he's excited about something, he wants to come tell me because I've been that . . . solid rock in his life."

As to D.T., mother testified:  When the visits begin, "[s]he's super excited.  The first thing she does is she screams 'hi' at the top of her lungs, and she'll . . . yell, 'Mommy and Daddy,' and . . . start blowing kisses at us until we can get her out of her car seat."  When the visits end, "she's a little bit distraught it seems like.  She doesn't want to go. . . .  [S]he has actually pointed to [father's] truck and said 'home' multiple times."  "She's very loving.  She loves to cuddle with me at all of our visits.  All she wants to do is sit in my lap . . . when we're eating . . . .  And she loves to have me go on the playground with her. . . .  [S]he just loves to be around me."

The section 366.26 report includes an evaluation of the prospective adoptive parents.  They "have had a relationship with [O.T.] since he was born."  D.T. was "placed in their care in September of 2019" when the children were detained.  "The prospective adoptive family and the children had a daily relationship in a parent-child rol[e] for approximately 4 months," after which the children were placed with "relative caregivers."  O.T. "has shown signs of sadness by crying when he has had to leave the visits with the prospective adoptive family."  "[T]he children ask for the prospective adoptive parents when they are not in their care."

5

*Juvenile Court's Ruling*

The court stated:  "[T]he children enjoyed visits with their parents" but "enjoyable visits – even when they're loving and appropriate – are simply not enough to overcome the benefit the law recognizes the children will receive if they are . . . allowed to make a strong bond with a new parental figure . . . .  [¶] . . . [T]he parents have never progressed from supervised visits.  And I don't believe that there's been sufficient evidence to show that these children would be greatly harmed if parental rights were terminated.  [¶]  So I don't find that the [parental-benefit] exception has been met, and I will order parental rights terminated so the adoption can go forward."

*Standard of Review*

The juvenile court found that appellants had failed to establish "the third element" of the parental-benefit exception – "[the] termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  In determining whether the third element has been met, the court "weigh[s] the harm of losing the [parental] relationship against the benefits of placement in a new adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)  "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""" (*Id*. at p. 641.)

6

*No Abuse of Discretion in Ruling that Appellants Failed*
*to Establish Third Element of Parental-Benefit Exception*

"When it weighs whether termination would be detrimental, . . . the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id.* at 633.) "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.)

The juvenile court acted within its discretion in concluding that appellants had failed to show that severance of the parental relationship would "harm the [children] to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The children were very young. At the time of the section 366.26 hearing in December 2020, O.T. was three years old and D.T. was one month shy of her second birthday. When children are this young, their "needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.) Before the children were detained in September 2019, O.T. had lived with appellants

7

for 23 months, and D.T. had lived with them for only nine months.  At the time of the section 366.26 hearing, the children had been removed from appellants' home for more than one year, a significant part of their short lives.

The interaction between appellants and the children appears to have had negative as well as positive effects.  After a visit with father in June 2020, O.T. had nightmares.  During appellants' visits, the children sometimes exhibited aggression toward appellants and fought with each other.  During a visit in February 2020, the parents "engaged in a verbal and possibly physical altercation" in the children's presence.  Bystanders called the police.  It is reasonable to infer that the altercation caused the children to suffer emotional harm.

A parent who seeks to invoke the parental-benefit exception "must do more than demonstrate 'frequent and loving contact[,]' an emotional bond with the child, or that parent and child find their visits pleasant.  Instead, the parent must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827, citations omitted.)  At a section 366.26 hearing, "[a] biological parent . . . may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.  [Citation.]  A child[, especially a two or three-year old child,] . . . should not be deprived of an adoptive parent [where, as here,] the natural parent[s have] maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Accordingly, the juvenile court reasonably concluded that appellants' "enjoyable visits," even though "loving and

8

appropriate," were "not enough to overcome the benefit . . . the children will receive if they are . . . allowed to make a strong bond" with their prospective adoptive parents.

*Inquiry and Notice under ICWA*

Father claimed that his paternal family has Blackfeet Tribe ancestry. Notice was given to the Blackfeet Tribe and the Bureau of Indian Affairs that the children "may be eligible for membership" in the tribe. The notice gave some background information about father, father's father, and father's grandmother. The Blackfeet Tribe responded that neither child qualified as an "'Indian Child'" within the meaning of the ICWA. The author of the response stated, "If you are able to gather more information on the ancestry of the parents, please contact me again and I will review the tribal rolls."

Appellants contend that the inquiry into the children's Indian ancestry was deficient because HSA contacted only the father. It "did not contact the [children's] paternal grandfather – the source of the Blackfeet heritage. [Record citation.] Nor did [it] contact the [children's] paternal great-grandmother, who was also noted as having Blackfeet ancestry, and was presumably still alive." As a result, the "[n]otices served on the Blackfeet tribe and the Bureau of Indian Affairs were missing crucial biographical information about the paternal family members . . . ." "[T]he . . . omissions . . . completely defeated the purpose of consulting the tribe[] . . . about membership eligibility."

Under California law, "[t]he court [and] county welfare department . . . have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition under Section 300 . . . has been filed, is or may be an Indian child."

9

(§ 224.2, subd. (a).) "Inquiry includes, but is not limited to, asking the child, parents, . . . [and] *extended family members . . .* whether the child is, or may be, an Indian child . . . ." (*Id.*, subd. (b), italics added; see also Cal. Rules of Court, rule 5.841(a)(1) [party seeking termination of parental rights "must ask . . . extended family members . . . whether the child is or may be an Indian child"].)

HSA states: "The record . . . is silent on whether HSA attempted . . . [to] contact[] paternal grandfather, whose name and phone number father provided, or paternal great-grandmother, whose name father provided. [Record citation.] The record therefore does not support whether HSA's . . . inquiry was 'proper and adequate' (§ 224.2, subd. (i)(2)) and thus whether the notice HSA then sent to the Blackfeet tribe . . . contained all the information HSA could gather about the children's potential Indian ancestry." "HSA agrees that the order terminating rights should be vacated and parental rights reinstated. [¶] The reversal, however, should be only for the limited determination of the applicability of ICWA . . . ." We accept HSA's concession. HSA requests that our disposition be similar to the disposition in *In re Jonathan D.* (2001) 92 Cal.App.4th 105, 111-112.

### Disposition

"The orders of the juvenile court terminating parental rights are [conditionally reversed] and the matter is remanded to the juvenile court with directions to order compliance with the [inquiry and] notice provisions of the [ICWA and California law. The required inquiry includes, but is not limited to, inquiry of father's extended family members.] If, after proper inquiry and notice, no response is received from a tribe indicating the [children are] Indian child[ren], [the juvenile court shall reinstate

10

all previous findings and orders].  If a tribe determines that the [children are] Indian child[ren], . . . the juvenile court is ordered to conduct a new section 366.26 hearing in conformity with all provisions of the [ICWA and California law]." (*In re Jonathan D.*, *supra*, 92 Cal.App.4th at pp. 111-112.)  However, if after proper inquiry HSA discovers no material information additional to that previously provided to the Bureau of Indian Affairs and the Blackfeet Tribe, HSA need not send a second notice to these entities.  Upon proof of proper inquiry, the juvenile court shall forthwith reinstate all previous findings and orders.  In all other respects, the orders appealed from are affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


PERREN, J.


TANGEMAN, J.

11

Tari L. Cody, Judge

Superior Court County of Ventura

_____

Elizabeth Klippi, under appointment by the Court of Appeal for Appellant Father.

Paul A. Swiller, under appointment by the Court of Appeal for Appellant Mother.

Tiffany N. North, County Counsel, Joseph J. Randazzo, Assistant County Counsel for Respondent.